The Honorable Judges of the United States Court of Appeals for the Fourth Circuit. Please be seated. As I said, we're having your argument in our last case, 12-21-23, Sawyer v. Asbury. Ms. Grew, please. Thank you, Your Honor. I apologize, I was in the wrong courtroom. I wondered why the panel had changed, but they were able to locate me. You were in the wrong courtroom? I was in the wrong courtroom this morning. Okay, we know it's a lesson to be in the future, because if you had, I dare say, if you hadn't gotten this panel, your case may be gone. Thank you. My name is Wendy Grew. I come from Charleston, West Virginia. I've been here once before. We're here today about constitutional rights, and not just constitutional deprivations, but also constitutional rights. Most particularly, the Seventh Amendment right to a trial by jury. My client, Jim Asbury, was accused of constitutional deprivations under the Fourth Amendment by Brian Sawyer. After Sawyer had been arrested, he was booked, and during the booking process, he claims that he had a broken nose and other injuries because of excessive use of force. So he did have a broken nose? He did have a broken nose, but his claim was that it was approximately caused by excessive use of force, therefore resulting from a constitutional deprivation. Now, after a jury verdict in favor of my client, the jury found that, in fact, there had been no violation of the Fourteenth Amendment. The judge re-reviewed the evidence, which in this case was a video. The trial transcript hadn't been done yet, by my understanding, so it was really the video that he was relying on. The court sat through the trial, presumably? Yes. An experienced district judge, a very experienced lawyer before that? Correct. A very experienced judge, and he had seen the video during the motion for summary judgment process. The video was played for the jury ad nauseam. I tried to count how many times. It was difficult because we would play part of it, and then the opposing counsel and I would each go through stills with each witness, and there were four witnesses. And the jury also had the video with them when they were reviewing the evidence before rendering their verdict. So there's no dispute that all of the evidence was presented to the jury. Here, however, the judge viewed the evidence differently. He granted a motion for judgment as a matter of law under Rule 50 after the jury found for the defendant. The basis for this was solely on parts of the video evidence. In doing so, it is our belief that he ignored the other evidence that was presented. Rule 50 does not allow a district court to weigh the evidence. He said he didn't. I'm sorry? He said he didn't. He said no weighing of the evidence or credibility determinations are permitted. I made none. So he knew he couldn't, and he said he didn't. Well, that is correct. He knows what the law is, and I'm sure that if he believed that he was not following the rule, he would not have issued that order. But we are all, at times, incorrect district courts, too. The video, as relied upon by the judge, the judge in his order did not refer to any of the evidence other than the video. The judge specifically found… Well, we know in the Supreme Court that if evidence conflicts with the video, the video controls, correct? Correct. And, in fact, I relied on… So that doesn't strike me as immediate an error. Correct. However, in this case, the video doesn't conflict with the evidence. It was the judge's weighing of the evidence and assessing credibility of witnesses that, in doing so, he weighed the video and his interpretation of it higher than the testimony of the witnesses. What's critical to point out here is this is not a movie that was played by the judge or by the jury. This was a stilted, motion-activated… I think you can rest assured that we've all looked at the video. Okay. Thank you. In fact, the district court admits what he recites in the order, granting judgment as a matter of law, what he recites are physical acts. Then concludes that those physical acts per se constitute 14th Amendment deprivation. And, in so doing, it is our position that he had to have ignored the testimony from all law enforcement officers about the basis for those acts. But can I just ask, the video makes plain that there was no physical aggression by the appellee before your client lunged at him. I disagree, Your Honor. And I disagree for this reason. If we look at the actual evidence that was brought in, the police officers testified that there were a number of events that occurred and displays of a threat by Mr. Seward. Right. They said he was turning his head. Correct. What is threatening about turning one's head? Well, I asked the same question. And, accordingly, that turning your head while you're undergoing a pat-down with your arms against the wall… Well, they said also crossing one's arms is some kind of aggression. Correct. Law enforcement refers to the initial one as a target glance. When the individual who's undergoing a pat-down is told to look at the wall and continues to look back at the officer to size him up, the law enforcement officers in the testimony were trained that this is indicative of a threat. Now, that evidence was not disputed. And that evidence isn't part of the video. But it had to have been discounted and not considered at all and weighed by the judge. No, but counsel, as we all saw the video, I know what you're talking about, is when the officer was removing the handcuffs, he took one hand at a time, one hand, I guess for police, because you want to be able to feel whether or not the person is moving, so you have one hand high, other hand low, and he switched hands to do that. But even when you say he looked back, there's a break there. He looked back, but then he's sitting down after that. So that looking back couldn't have been the basis for the lunging choke. No, Your Honor. One event does not trigger another event. It's a cumulative set of circumstances that we cannot view in a vacuum. So the point is that he's ratcheting up in terms of a potential person for violence. Exactly, Your Honor. And that's why, in and of itself, we completely agree that the potty mouth that Mr. Sawyer was displaying that evening, in and of itself, and what we called idle threats, like my client testified, well, sure, he threatened to kill my wife, but I don't have one. And your client, I think, acknowledged, albeit not very forthrightly, that he couldn't remember, but that he may have also been engaging in some unpleasant language. Correct, right there in the booking process. That's there in the record. Right, right there at the booking process. So that's not what we're saying was indicative of the threat. What is indicative of the threat to the law enforcement officers and the evidence that was presented to the jury, and not the video, was an escalation, the target glance, the locking up of the body. And understand the locking up of the body, this video has no audio. The locking up of the body is in conjunction with the refusal to obey lawful verbal commands by law enforcement officers. Every law enforcement officer testified, and this was not disputed at trial, that this individual, based upon their perception, posed a threat. Did that appear, their worry about that on the video? One of them sitting at his desk doing something? When I'm threatened, I'm usually, or I see a friend that's threatened. They did not perceive, the testimony was that they did not perceive that Deputy Asbury would have any difficulty in handling the threat. When the threat became physical, the officers reacted. Now, there's testimony about, well what does that reaction time mean? Did they react fast enough? Well that doesn't mean that somebody's constitutional rights were deprived. The amount of time an individual takes to process what's occurring, and their response time, is not dispositive of the issue of whether or not Mr. Sawyer's constitutional rights were deprived. Now, the physicality that the court discusses, the court relies on interpretation and not actual contact, in finding that the video displays unlawful, excessive force. There is no punch landing on Mr. Sawyer. The court interprets a movement by Mr. Sawyer's head, following movement by Jim Asbury's arm, as conclusive of a constitutional tort. Now, or constitutional deprivation. Was there testimony by your client that he never lands a punch? Was the testimony on the other side? I'm sorry? What is the testimony on the other side? The testimony on the other side changed. The testimony on the other side was... Changed from when to when? Every single time the plaintiff made a statement under oath. The first time the plaintiff testified that he was punched, he testified that he was punched by Jim Asbury during the pat-down. What did the plaintiff testify to at trial? Three things. He testified that he had been punched by Jim Asbury when he was standing up against the wall being patted down. Then he testified that was wrong. He was actually punched in the face repeatedly while Deputy Asbury was sitting on his back after they were trying to handcuff him. Because we can't see that. The video doesn't tell us the right answer to that one way or the other. Right, and then he said, no, I must be wrong again. And during the trial testified, after seeing the video for the first time, he said, oh, that's where I was punched. Okay, so we have three different versions. You have your client saying he didn't punch him in, and we have the plaintiff saying he did punch him in. Correct, and we have the tape. Correct, we have the tape. Now, what is consistent with the movement, the judge appears to conclude that there was a punch, and we can separate punch, too, from an unlawful constitutional deprivation. But the first is that the judge interprets a punch. The testimony from all law enforcement officers were, one, there wasn't a punch, and two, that movement was consistent with what actually occurred, and that is the application of a pressure point in the upper chin line or jaw line area. Completely consistent testimony with what is shown on the video. Now, what you also don't see on the video is you don't see blood coming out of his nose. Okay, now, this race ipsa argument, I think, is what the court is actually saying. Guy walks into a booking room. Guy comes out with a bloody nose. We don't know it's fractured. It's not a shattering of the nose. It's a broken nose that he gets an ibuprofen for. Now, because that occurred, there had to be a deprivation of his 14th Amendment rights. There was an injury, and there's no explanation for the injury. Well, that's not what the law is. The law is that law enforcement are entitled to use force for legitimate purpose, and here there was no evidence that contradicted the law enforcement officer's testimony, whether their belief was correct or not. It was reasonable for a law enforcement officer to anticipate and expect that Mr. Sawyer was an imminent threat, and based upon their training and experience, they had the right to go hands-on at that moment. The hands-on that the law enforcement officers testified to were pressure points and a takedown and a shoving of the plaintiff up against the wall. What I don't understand is this. It's undisputed by the film or video that he was sitting down at the time, correct? Correct. What did the officer want him to do? Stand up. He was sitting down in defiance of the commands. Ironically, to be photographed. No, no, no. The time is up, and the lead judge is being gracious that we ask this question, so let's keep it very narrow. Okay. What did he want him to do? To stand up to be photographed. Stand up to be photographed. Correct. All right. So the pressure point was to get him up. No, Your Honor. After he was told three times to get up to be photographed, then he threatened to take the badge. All right. Right. And then Deputy Asbury testified that then physically Sawyer moved towards him, and at that point Deputy Asbury went in because he perceived that as a threat. And that's what the judge said he didn't see on the video. That's what the judge says he didn't see on the video. I must say it's rather elusive, too, when I saw it. You know, I mean, that's why we have to go with the law enforcement officers who have seen it. No. The Supreme Court's told us we go with the video. That used to be the law. You had no video here. I don't think that the video illustrates that this law enforcement officer was unreasonable in perceiving a threat at that time. I understand that, Your Honor. Thank you. Thank you. Counsel? Thank you. May it please the Court. I'm John Bryan from Union, West Virginia, and I represent Brian Sawyer, the plaintiff in the underlying case. And, Your Honors, it's an honor to be here, and it has been an honor for me to be involved in this case. The district court below said it best. In the May 18th order, almost a year ago today, when Judge Goodwin wrote, what the video shows cannot be reconciled with the jury's verdict. The video shows Deputy Asbury grabbing the plaintiff by the throat. The video shows Deputy Asbury punching the plaintiff in the face with his fist. The video shows the officers leaving, the injured Mr. Sawyer lying on the holding center floor. Mr. Sawyer walked into the holding center, uninjured, and he left with a fractured nose and a battered face. While Mr. Sawyer's verbal threats against Deputy Asbury were disgusting, they were still only words. And the pretrial detainee's words do not justify an officer's use of such force. There are essentially two issues before the court today. The first is whether the district court exceeded its authority in granting a renewed motion for judgment as a matter of law, or this jury ignored overwhelming evidence, videotaped evidence, that Deputy Asbury used excessive force, causing a facial fracture and other facial injuries, in violation of the 14th Amendment. The second issue is whether the district court properly denied qualified immunity to Deputy Asbury, again, where we have videotaped evidence and other evidence, which is indisputable, showing that Deputy Asbury choked and punched Mr. Sawyer for, quote, merely running his mouth. Counsel, you tried this case, correct? Yes, Your Honor. And you heard the testimony of the officer, when he described what he said was the pressure point that he was trying to get to, correct? Yes, Your Honor. Would you point to, on your body, where about, if this is where that was? Well, the... Can you point to, on your body, where it was? Well, I don't believe, Your Honor, that this was a pressure point. So I guess you'd relate the testimony. It would be right to the throat. It was essentially a choke. I would call it a choke, and Deputy Kearns and Deputy Massey would call it a choke. No, see, I'm not making any conclusion about whether it was a choke or not. This is just position on the body. That's all. So it is around the neck? Deputy Asbury admitted that his hands were on the throat of Mr. Sawyer, and the other deputies... But that is also his testimony. That's his testimony. I'm not asking you to concede it. That is also physically where the alleged pressure point is also. Correct? Correct, Your Honor. And actually, Deputy Kearns, he actually alleged that there were, instead of a choke and a punch, there were two separate pressure point tactics, one to behind the ear and one to the throat area and one to behind the ear. And my next question is this. Why couldn't the jury conclude that what they saw was an officer going for that pressure point at his throat? As of currently, I guess we assume they did. Well, the district court ruled that... No, I'm not talking about the district court. I'm talking about the jury. It was a finder of fact. Why could they not believe, since the testimony was that it was in the throat area and it clearly shows he did go for the throat. Now, the video, it doesn't get to the point of fine-tuning as to... But it was his throat. Why couldn't the jury, as he presumably did conclude, that the officer was going for a pressure point to control him and not, as we would call colloquially, choke him? That's my question. Why would there not be a reasonable interpretation of the facts for the trial of facts here? Because, Your Honor, Deputy Asbury did not testify that he was trying to inflict a pressure point tactic. I thought you said that's what he said. I'm sorry, I misunderstood that. No, Your Honor, I'm sorry. He didn't testify that he was going for... No, Your Honor, it was... The counsel said that's what he was going for. It was Deputy Kearns who testified for the first time ever, my first experience meeting him, was at the jury trial. So I was kind of surprised that he said this. What's the testimony as to Asbury as to why he went around the throat there? Here's what Asbury said. Asbury admitted that he asked Mr. Sawyer to stand up and that when he refused, he then applied force. Force, okay, just force. He said he applied force. Mr. Asbury admitted that he, being Asbury, made a sudden movement towards Mr. Sawyer, grabbing him in the throat area, was his testimony, and that was page 182 in the joint appendix.  was sitting down at the time that he was attacked and that Mr. Sawyer was given no warning that sudden physical force was about to be inflicted on him. Mr. Asbury admitted that Mr. Sawyer never physically assaulted him or any other officer that day in the holding center, but that he was merely just running his mouth. Deputy Asbury testified that he inflicted force on Mr. Sawyer, excuse me, Mr. Sawyer, merely because Mr. Sawyer was, excuse me, merely because he deemed the threats that Mr. Sawyer was making as requiring him to inflict force. In other words, a preemptive strike. A preemptive strike, Your Honor. Well, okay, maybe you can help me with the J.A., because as far as the throat is concerned, you asked him, is it true that you grabbed Brian Sawyer, that you had your hands on his neck? No. You didn't choke him? No. It's at 183. It's at 183, the top of 183. Okay, let's see. And on 189, he says he didn't punch Mr. Sawyer. I'm sorry, Your Honor, I have two actual citations for the, when I said that Asbury admitted that he made a sudden movement towards Sawyer, grabbing him in the throat area, I have two separate citations for that. It's 182. Right. 182 lines 1 through 3 on that page 98 of the trial transcript. And also at joint... Okay, that says, would it be fair to say that when you grabbed a hold of Brian Sawyer that it was a very sudden movement on your part? Yes. And, Your Honor, that was a sudden movement part, and for the throat area part, that came from, I believe, Joint Appendix page 186, lines 1 through 9, which hopefully that lines up to what I wrote down. Well... And he did testify his deposition as well, that he put his hand... It's the deposition. So it's your deposition, did you ever place your hands around his neck? Answer, I placed my hand on his chest in the upper chest and throat area. Yes. And then he responds, yes, that is correct. So he's affirming his deposition testimony. So does that refresh your recollection? He says, in my deposition, apparently I said chest and throat. Yes, Judge Monson, in any event, Mr. Asbury did admit to inflicting force on Mr. Sawyer suddenly, without any warning, while Mr. Sawyer was sitting down, and that in that infliction of force that his hand, even Asbury admits, went into the throat area, he did not say that he was using a pressure point tactic that he was trained at the Academy on or anything like that? No, he says, you admit you did not give Brian Sawyer any warning that you were about to use to answer, I did not. That is correct, Your Honor. And Mr. Sawyer, excuse me, Mr. Asbury denies striking Brian Sawyer in the face. He denies punching him. He denies striking him in the back of the head, causing his face to impact with the ground or anything like that. Now, this is important, especially in light of the fact that Deputy Asbury admits that he was the person who was in control of Mr. Sawyer's head and shoulders during this ordeal. So we know that it wasn't anybody else who may have inadvertently caused these facial injuries to Mr. Sawyer. If anyone did it, it was the only person there with his head and shoulders was Defendant Asbury. Now, Mr. Asbury also admitted that Mr. Sawyer was injured as a result of the use of force that he inflicted on Mr. Sawyer. He admitted, and this was when... I have a question. I'm sorry to interrupt. Before your time is up, I wanted to ask it. In the district judge's opinion, he says that the guilty plea of the plaintiff in connection with what transpired at the home was, in terms of assaulting Deputy Asbury at the home, was not related to what happened at the holding center. If you're an officer looking at the events as they're unfolding at the holding center, wouldn't it be part of the calculus that you could consider that there was this event at the home prior to getting to the holding center that would make it reasonable to interpret the body language of Mr. Sawyer as threatening? Well... Here he was just moments a little bit earlier, the same night he's engaged in contact with the officer that leads to a guilty plea for assaulting the officer. What happened at the house was, and I'm going to answer your question, what happened at the house was my client, Mr. Sawyer, his testimony was that he was upset that he was being taken out of his house and arrested, and he kicked at his own door. He just was frustrated, kicked at his door on the way out. Well, actually I think the testimony was something like Deputy Asbury moved out of the way and it ended up that he kicked the door. Well, that's what Asbury said. What did Asbury say? My client always maintained that he kicked at his door, he didn't try, he kicked at the door frame. Except when he pled guilty. My client tells me that if they charge you with two or three different things and they offer you a plea deal, you plead guilty to this and you get no jail time, minimum fine, he's going to take it. He may be, but it becomes your trail. Yes, it's a fact. It's a fact. How much time elapsed from apprehending him at his house? How far is his house from the station? I don't know that, Your Honor. Parkersburg is not a huge city, but when he was kicked at the door frame, my client alleged that at that time Asbury choked him. That was the first time that he choked him and we had a Fourth Amendment claim based on that and the judge issued some re-judgment on that because of the guilty plea. But after that, another officer arrived at the scene. Brian Sawyer was placed in handcuffs and he alleged that he was choked while he was in handcuffs. So there was a continuation of physicality between the two of them? No, there was no continuation, Your Honor. What do I mean by that? Continuation of abuse, according to him. Abuse. Abuse. Abuse. Right. Well, Brian Sawyer did allege that he was kind of slammed into the patrol cars as he was being put in handcuffs and so once inside the cruiser, the evidence was, and I believe it's undisputed, that Brian Sawyer was running his mouth in the cruiser saying things that would upset that he was trying to upset Deputy Astor, but otherwise, he was being physically compliant. But didn't that put him in a high, elevated category? I'm going to take the facts best to your claim. He was frustrated. He kicked the door and he was choked or he was put in, bottled his head into the cruiser and he's still mopping at armed police officers trying to make those crude things. He was saying some disgusting things to Mr. Asbury. He said, do you wonder what your wife is doing this time of night or something like that. Yeah, yeah. They were very powerful things, but we'll agree they were crude. But the point is this. Doesn't that put you in an incredible category? Most people are sugaring their boots when a police officer stops them with a blue light on the highway for speeding, let alone police officers have already done these things to you. He does what your client says and he's still arrogant or whatever and have enough chutzpah or whatever you want to call it to say, yeah, and yeah, and you did this and your wife and I'll take your badge and shove it up your derriere. I mean, doesn't that put you in a category where a police officer is like, this guy is real deal. Judge, legally, I don't believe it has any effect on this, but factually, I think it's part of the reason why we're here. I don't like what Mr. Sawyer said. They did not like what he said. But as far as making it reasonable for him to be choked and punched, it did not because Mr. Sawyer was physically compliant even though he was running his mouth in the vehicle. He wasn't shaking the vehicle. He wasn't spitting. He wasn't doing anything physical. He was let out of the vehicle, no problem. He went into the holding center, no problem. He was asked to stand back up. He stood up. At that point, they took his handcuffs off. And if he was such a threat or if he was dangerous, they would not have taken his handcuffs off. And once they took his handcuffs off, he complied. He put his hands on the wall and after his handcuffs were off, they told him to sit back down. He sat back down. It was only after that point that Deputy Asbury walked up to him, stood over him. And not only was Brian Sawyer running his mouth, but he was running his mouth back at him. So in my opinion, that is not proper police tactics. If you are really, if you are really worried that this person could be violent, and there were three other officers there just in case there were any problems, they were unconcerned off to the side. If there was any problems, you shouldn't have taken the handcuffs off. And if there were any problems, you should have just seen his fist pounding on your chest. And you can see in the video that Brian Sawyer, and this is consistent with his testimony, that he crossed his arms and crossed his legs. His elbow went up a couple of times. What was he doing there? I believe they were arguing and he was... But his elbow did like this a couple of times. What was he doing? I don't know, but he did. I saw the way he did. I asked if I was trying to provoke him into some sort of physical altercation. Well, the officer basically says that, too, because he shouldn't be crossing his arms and legs. He was... In doing that, he was showing that he wasn't cooperating. Isn't in the officer testimony that way? The officer said that he asked him three times to stand up and that he didn't, so he used force on him. And then earlier today, I think that your colleague said that also crossing legs was bad. And so it seems to me that the parties are consistent on that your man was crossing his arms, crossing his legs. You think that's okay? They think it's bad. But there's no argument about what he was doing. So it certainly aren't. I mean, we can see it on the video, but... How long is the video in total? It's very difficult to watch, Judge. In total... I have watched it. So I want to know, I thought maybe you could tell me how long it is in total, starting where the video begins and where the video ends, not just this incident. Well, the problem is there's two different time frames. One is real time when you press play, and then the other is actual time when you're watching the time elapse on the video because it freezes. It freezes, and it might be stuck at, you know... Okay, so in real time, how much time elapse between the time he came in and the time that this altercation began? This happened maybe within six to eight minutes, probably, and then he was left on the floor, which I did count for, I believe, 14 minutes. The problem as counsel I have, though, is this. If you help me with this, the beauty of living in America, we have the land of liberty and freedoms, and in the rarest situations, the police officer is one of the few people, maybe the only person that can put their hands on you unless another person is defending themselves from your aggression. So since police officers are authorized to put their hands on you, if a police officer gives you a command three times to do something and you don't do it, isn't the police officer authorized to put his or her hands on you? There are de-escalation techniques. There are soft hand techniques. There is the act of just putting hands on somebody and handcuffing them, standing them up. He skipped that and went straight. He skipped the first three basics. Look at the history, though. The history is this man just assaulted me, which he pled guilty to. He's violent. He's saying crude, nasty things. He's using defiant gestures, like folding his arms. He's saying all these things. And a present threat, not I will, I'm going to take your badge and shove it up your rear end. And then you have to make a decision that this person who will not obey your command and you clearly have the right to put your hands on him, then I think that I need to put my hands on a way that he can't not clearly come back at me. Ordinarily, you might say, hey, buddy, let's move on. But then you take a move that clearly controls you, because it's not really choking somebody to the point of taking breath out. It's using the throat to push you back because the maneuver is so sensitive. If I have you in the throat, I can control you straight back and up. How do we say, as a matter of law, that video makes it so clear that a jury couldn't make that conclusion? Judge, I'm out of time. I would like to... You can answer the question. Your Honor, and I would ask you also to look at the Jones v. Buchanan case. I'll do my homework, but just answer that right now. Well, Judge Mox, I know offered the Jones v. Buchanan case and I admit, Judge Box, I don't want you to miss the opportunity. But maybe you want to... You relied on Jones. Do you have anything else to say in response? Well, it's similar in that... Go ahead. In that the person was... The person was being verbally belligerent, was saying foul things, and not only that, in that case, the person went to stand up and try to get out of the handcuffs or adjust them in some way. In this case, it's different in that Deputy Asbury admitted that he could have asked the three other officers who were there available to assist in case there were any problems who were unconcerned. He could have asked them to help get Mr. Sawyer re-handcuffed or make him stand up if he wasn't going to stand up. But the fact is, it was a physical use of force which undisputedly injured and fractured Mr. Sawyer's nose and which was in response to the fact that he was being         Thank you. Stick with us. And it occurred. The jury saw the evidence and it had to interpret it. The video doesn't tell everybody everything. The judge, no judge, has the right to go back and filter through all that evidence and weigh it and assess credibilities. And in our case, that's what occurred. Now, very briefly, the qualified immunity argument came into play because there were repeated mentions by the court that a punch alone is per se a constitutional deprivation. Now, if we assume a punch occurred, there is no law in the Fourth Circuit that alone a punch is per se excessive force. In this case, it was established that the officers did perceive threat. Well, if an officer perceives a threat and acts on it physically and punches somebody in the face, does that automatically make it a Fourth or Fourteenth Amendment deprivation? You know, I know the judge can't assess credibility and certainly we can't, but it's just interesting how consistent the officer's testimony is that it's a danger cue. For example, Kern said it's a danger cue if somebody is going to be looking back as you're being handcuffed or unhandcuffed or if your arms are crossed. And it reminds me of the case, and I can't recall the name, from the Fourth Circuit where the trial judge, the police had argued that having your bag from the cleaners hanging in the car is a sign that you must have drugs in the car. And the district judge rejected that and the Fourth Circuit affirmed. I might have been gargling on it, but I can't recall. Anyway, it seems like, why would somebody just having their arms crossed make it even seem like a threat? To me, it's somebody trying to make sure they don't do something wrong so they're restraining themselves. And this is just an excuse to justify what happened. And that's why, thank goodness, neither you nor I are in a position of having to assess threat. And that is what the law enforcement officer is trained to do. And they're trained, I don't know if it's right or wrong, but I can tell you that the body of police science that trains them and comes up with this says that these behaviors are indicative of a threat to an officer because they are, and this is the term of art that they use. I'm not a police officer, but I know I can use legal terms of art. These are their terms of art. The trial testimony to that effect? Yes. Okay. So that was before the judge that there's a police science. Well, not those words, but that was consistent with their training. The recognition in response to those cues were consistent with the training of all three officers. And if I may very briefly... Why did they uncuff him then? At that point, the threat had diminished. And they were going to uncuff him... This is all within a few minutes. Correct, and it escalated again. Your time has expired. Thank you. Thank you. We will ask our clerk to adjourn court, and then we'll sit down and greet the lawyers. This honorable court stands adjourned. Signed, I, God Save the United States, and this honorable court.
judges: Diana Gribbon Motz, Roger L. Gregory, Ellen L. Hollander